**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN W. LANDERS, DELORIS I. LANDERS, ON BEHALF OF THEMSELVES, ALL OTHERS SIMILARLY SITUATED, AND THE CLASS THEY SEEK TO REPRESENT, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No.        1:17-cv-20 |
| vs. | ) ) | JURY TRIAL DEMANDED |
| MONSANTO COMPANY, | ) ) | |
| Defendant. | ) | |

## CLASS ACTION COMPLAINT

COME NOW Plaintiffs Steven W. Landers and Deloris I. Landers, on behalf of themselves, all others similarly situated, and the class they seek to represent, and for their Complaint against Monsanto Company, state as follows:

## SUMMARY OF THE CLAIMS

1.      This is a nationwide class action against Monsanto Company ("Monsanto").  Each plaintiff is an agricultural farmer and/or agricultural farming organization that raises crops in the United States (hereafter, Plaintiffs Steve and Deloris "Dee" Landers, all others similarly situated, including Doe Plaintiffs, and the class they seek to represent are referred to, collectively, as "Plaintiffs").  While Plaintiffs grow a variety of crops in ten (10) different states, including the states of Alabama, Arkansas, Illinois, Kentucky, Minnesota, Mississippi, Missouri, North Carolina, Tennessee, and Texas (hereafter, "the affected states"), they have at least one (1)

important characteristic in common – they are among the hundreds of farmers throughout the nation who have been victimized by Monsanto's defective Xtend seed system and its purchasers' inevitable use of dicamba, a drift-prone herbicide that has wiped out hundreds of thousands of acres of farmland in the United States.

2.      In an August 2016 Compliance Advisory, the Environmental Protection Agency ("EPA") identified the ten (10) states referenced in Paragraph 1, above, as states where complaints alleging misuse of dicamba products had been received by state departments of agriculture.

3.      The cause of the destruction to Plaintiffs' farms and crops is Monsanto's willful and negligent release of its genetically modified ("GM") Round Up Ready Xtend Crop System, which includes Monsanto's Roundup Ready 2 Xtend soybeans ("Xtend soybeans") and Bollgard II Xtend cotton seeds ("Xtend cotton") (collectively "Xtend seeds" or "Xtend crops"), without an accompanying, EPA-approved dicamba herbicide.

4.      GM seeds are designed to help farmers combat problematic weeds that have evolved to resist certain herbicides.

5.      Monsanto's Xtend seeds are genetically modified to resist the herbicides dicamba and glyphosate, the latter being the main ingredient in Monsanto's most prized herbicide product, Roundup.  This genetic modification allows farmers to plant Xtend seeds and then apply those herbicides to the Xtend crops without causing injury to the Xtend crops.

6.      While Monsanto's Xtend crops are tolerant to both Roundup and dicamba, it is the diminishing efficacy of Roundup that makes dicamba the necessary answer and ingredient to rising weed resistance.

7.      But when Monsanto distributed and sold its Xtend seeds to farmers in the affected states, Monsanto did so without releasing a corresponding herbicide for use as a complete crop system with those Xtend soybean and cotton seeds.

8.      Monsanto's own website identifies the Xtend products as a "crop system" and identifies both the seeds (Xtend) and the herbicides (VaporGrip) that should be used in conjunction with the seeds.  But Monsanto sold the seeds before the EPA approved the herbicides for market.

9.      In fact, at all times relevant to this Complaint, there was not a single dicamba product registered for in-crop use with Monsanto's new GM soybean and cotton seeds.

10.     Any in-crop use of dicamba on the Xtend seeds was and is a violation of federal and state law.

11.     The result of Monsanto's greed and experimentation in releasing its defective Xtend crop system has resulted in nothing short of an economic and ecological disaster for citizens of the affected states, especially Plaintiffs.

12.     The use of old dicamba over-the-top, i.e., once the seed is in the ground until it is harvested, was never approved by the EPA for in-crop use with these new GM seeds.

13.     The dicamba-based herbicides that Monsanto has designed for use on its Xtend seeds are called VaporGrip.

14.     Monsanto claims VaporGrip will have a lower volatility formulation that will minimize (though not entirely eliminate) drift – a term used to denote the airborne movement of herbicide spray particles to non-target or neighboring spray sites many miles away.

15.     Monsanto did not sell, distribute, or release VaporGrip in 2015 or 2016, as the herbicide label for VaporGrip had not received approval from the EPA.

16.     On November 9, 2016, well past the 2016 growing season, Monsanto received regulatory approval from the EPA, albeit conditionally for only two (2) years, for one (1) of its VaporGrip products, an herbicide called XtendiMax with VaporGrip Technology ("XtendiMax").

17.     The EPA may register pesticides conditionally when there are outstanding data requirements or under other circumstances.  During this conditional registration, if Monsanto does not comply with the conditions, the EPA may cancel the registration.

18.     Monsanto's other VaporGrip herbicide, Roundup Xtend with VaporGrip Technology, an allegedly low-volatility herbicide premix of dicamba and Roundup, remains unapproved.

19.     Monsanto's proposed herbicides may not solve the dicamba problem.  Concerns for the safety and efficacy of these herbicides have resulted in calls for more research before they are approved.  Efforts are underway to ban the use of these dicamba herbicides in several states, including the affected states.

20.     Having no approved herbicide to complete the Xtend system, farmers in the affected states who purchased and grew Monsanto's Xtend cotton and soybean crops were left with the unenviable choice of either allowing their Xtend crops to be destroyed by weed overgrowth or to use the only dicamba that is currently on the market – old dicamba – to spray on their Xtend crops.

21.     With a seed that is designed to resist dicamba, it is reasonably foreseeable – indeed, it was inevitable – that farmers would apply the old, highly volatile, and drift-prone dicamba to their dicamba-resistant soybeans and cotton.

22.     Dicamba is a highly volatile herbicide and is prone to drift.  When dicamba drifts and is readily moved by the wind during application onto surrounding crops and vegetation that

4

have not been genetically modified to withstand the herbicide, dicamba damages the surrounding non-GM crops.  Even the slightest trace of dicamba will destroy non-dicamba-tolerant vegetation.

23.    Volatilization occurs when dicamba is applied to a crop, such as the Xtend crops, but then evaporates into the air where it is easily moved off-target as the air moves.

24.    Dicamba is proven to volatize and can move miles away from its intended target.

25.    Calm and windless environments that might minimize drift, ironically, maximize the potential for volatilization.

26.    Volatilization can also occur for days following an initial application of dicamba. This prevents farmers and applicators from being able to take adequate measures to prevent both drift and volatilization.  This is a no-win situation for such farmers and applicators, and the same situation applies to sensitive crops within several miles of where dicamba is applied.

27.    Crop damage caused by volatilization is not a violation of the herbicide label, unlike crop loss caused by drift.  Weather conditions during herbicide application are the deciding factors for determining if misapplication has occurred, not what happens later in time.

28.    Numerous areas of the country, including the affected states, whose farmlands are vulnerable to dicamba have been devastated wherever Monsanto sold and distributed its Xtend seeds.

29.    Yet despite knowledge of the foregoing, Monsanto not only sold its Xtend seeds in the United States, but Monsanto specifically targeted the affected states as focal points of sale for these new, dangerous, and defective seeds.

30.    Monsanto violated standard industry practice and legal standards by releasing its Xtend seeds on the market without an existing, approved, safe herbicide.

31.     Throughout the affected states, state departments of agriculture have been besieged with complaints from farmers, including Plaintiffs, about pesticide drift and resultant crop damage. For instance:

a) There have been nearly 200 pesticide drift complaints in Missouri since Monsanto launched its defective crop system for soybeans and cotton in 2015.  *See* http://www.wsj.com/articles/farmers-illegal-use-of-herbicide-takes-toll-on-neighboring-crops-1470130201 (last visited Jan. 18, 2017);

b) Tennessee also reported at least 45 complaints related to pesticide drift.  *See* https://www.dtnpf.com/agriculture/web/ag/news/article/2016/08/03/states-dig-dicamba-claims (last visited Jan. 18, 2017); and

c) Arkansas reported at least 26 complaints related to pesticide drift.  *See id.*

32.     Plaintiffs' crops are not resistant to dicamba and have been decimated by dicamba damage due to farmers and applicators in the affected states who sprayed dicamba over-the-top of their Xtend seeds.  Accordingly, Plaintiffs Landers bring this suit on their own behalf, on behalf of all others similarly situated, and for the putative class.  They assert eleven (11) claims against Monsanto for: (1) Strict Liability – Design Defect; (2) Strict Liability – Failure to Warn; (3) Negligent Design and Marketing; (4) Negligent Failure to Warn; (5) Negligent Training; (6) Breach of Implied Warranty of Merchantability; (7) Fraudulent Concealment; (8) Unjust Enrichment; (9) Punitive Damages; (10) Civil Conspiracy; and (11) Class Action.

## Jurisdiction and Venue

33.     At all times relevant to this Complaint, Monsanto is the entity that researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised, and sold herbicide-tolerant cotton seeds under the brand name, Bollgard II XtendFlex, that are allegedly resistant to the dicamba herbicide to protect crops from harm caused by weeds, most especially from highly aggressive pigweeds such as Palmer amaranth, waterhemp, and marestail.

6

34. At all times relevant to this Complaint, Monsanto is the entity that researched, designed, formulated, compounded, developed, tested, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised, and sold herbicide-tolerant soybeans under the brand name, Roundup Ready 2 Xtend, that are allegedly resistant to the dicamba herbicide to protect crops from harm caused by weeds, most especially from highly aggressive pigweeds such as Palmer amaranth, waterhemp, and marestail.

35. This Court has diversity subject-matter jurisdiction over this class action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) because this is a class action where members of the putative class are citizens of different states than Monsanto and the aggregate claims of all members of the class are in excess of five million dollars ($5,000,000.00), exclusive of interest and costs. Plaintiffs are citizens of Missouri and many other states.

36. This Court has personal jurisdiction over the parties because Plaintiffs submit to the jurisdiction of the Court and Monsanto systematically and continually conducts business throughout the state of Missouri, including the sale and distribution of its Xtend seeds, and Monsanto has its principal place of business and world headquarters in Missouri.

37. Venue is proper in this District because Monsanto is engaged in substantial conduct and business relevant to Plaintiffs' claims within this District, Plaintiffs Landers and other similarly situated Plaintiffs suffered substantial losses from dicamba herbicides sprayed on Monsanto's Xtend seeds within this District, and it is where Plaintiffs Landers and others similarly situated reside. *See* 28 U.S.C. § 1391(b)(2).

## The Parties

38. Plaintiff Steven W. Landers ("Plaintiff Steve Landers"), is a resident of Lilbourn, New Madrid County, Missouri.

39.    Plaintiff Deloris I. Landers ("Plaintiff Dee Landers") is a resident of Lilbourn, New Madrid County, Missouri (hereafter, Plaintiff Steve Landers and Plaintiff Dee Landers will be referred to, collectively, as "Plaintiffs Landers").

40.    Doe Plaintiffs are other similarly situated Plaintiffs who reside in the following affected states: Alabama, Arkansas, Illinois, Kentucky, Minnesota, Mississippi, Missouri, North Carolina, Tennessee, and Texas.

41.    Monsanto, a global agrochemical and agricultural biotechnology incorporated in Delaware and headquartered in St. Louis, Missouri, was one of the first companies to apply biotechnology industry models to agriculture, and is most widely known for being the leading producer of GM seeds and herbicides such as Roundup, among other agricultural changes and biotechnological trait products.

## ALLEGATIONS COMMON TO ALL COUNTS

### A.    Plaintiffs Landers

42.    Plaintiffs Landers are husband and wife.

43.    Plaintiffs Landers own a fourth (4th) generation, family-owned farming operation in New Madrid County, squarely within Southeast Missouri and the epicenter of the dicamba drift complaints in Missouri.

44.    Plaintiffs Landers are soybean, corn, and cotton farmers who grow crops on land that they own and also lease.

45.    Plaintiff Steve Landers began his farming career in 1976 with a small plot of forty (40) acres located in New Madrid County, Missouri.

8

46.    Over the years, Plaintiffs Landers have built their farming operation into several farms that consist of 1,550 total acres of soybeans, corn, sometimes cotton, and other crops, to comprise a significant agricultural footprint in Southeast Missouri.

47.    Plaintiffs Landers own one hundred percent (100%) of the crops on their forty-five (45) acre farm and at least sixty-six percent (66%) of crops on the farms they lease.

48.    Plaintiff Steve Landers is a highly sought-after farmer.  Land owners come to him to farm their land, including his father, Don Landers, his aunt, Helen B. Landers, and also Jack Miller, Virginia Topping, and R. L. Evans.

49.    For example, Plaintiff Steve Landers has farmed land owned by Jack Miller since 1977.

50.    While it is normal practice for land owners to rent their property to other farmers, it is a testament to Plaintiff Steve Landers' reputation as a farmer that others have sought to enlist his farming expertise for decades.

51.    Today, Plaintiffs Landers regularly employ up to two (2) other workers to help them on their farms.

52.     In a typical crop year, Plaintiffs Landers' harvest produces over 43,200 bushels of soybeans and over 144,780 bushels of corn, on average.

53.    Per acre, Plaintiffs Landers' crop yields are approximately sixty to seventy (60-70) bushels for soybeans and approximately 190 bushels for corn.

54.    Plaintiffs Landers sell their crops to Cargill in New Madrid, Missouri.

55.    Cargill is a global food, agricultural, financial, and industrial products company that sources, trades, processes, and distributes grain and oilseeds.

56.     The damages suffered by Plaintiffs Landers due to Monsanto's release of its defective crop system are similar to the damages experienced by all Plaintiffs.

### B.      A Brief History of Roundup

57.     In the 1960s, Monsanto was still not a major player in the agricultural industry and was widely known as a major producer of dioxin-laced Agent Orange.

58.     In 1970, that all changed when Monsanto discovered the chemical properties of glyphosate, currently the company's flagship herbicide, and began marketing it in products in 1974.

59.     Glyphosate is the main ingredient in Roundup, and is a non-selective herbicide used to kill weeds that commonly compete with the growing of crops.

60.     A non-selective herbicide tries to kill most plants while a selective herbicide is designed to kill specific types of plants, usually grasses or broad leaf weeds.

61.     For more than forty (40) years, Roundup has been manufactured, sold, and distributed by Monsanto to farmers all over the world.  Roundup is registered in 130 countries and is approved for use on over 100 crops.

62.     Because Monsanto's Roundup products are ubiquitous, Roundup has become a household name.  Roundup is the most heavily-used agricultural chemical in the history of the world.

63.     The success of Roundup is key to Monsanto's dominance in the seed and herbicide marketplace.

64.     From the outset, Monsanto marketed Roundup as a safe herbicide for widespread commercial and consumer use, deemed to pose no unreasonable risk of harm to the environment or human health.

65.    Monsanto's marketing claims regarding Roundup's safety have not been without contention and in recent years have come under fire.  In March 2015, the World Health Organization ("WHO") announced findings that glyphosate is "probably carcinogenic to humans."

### C.    The Rise of GM Seeds

66.    An important factor in Monsanto's and Roundup's ascension during the 1990s was the development and launch of its GM corn and soybean seeds in 1996, sold under the brand name, Roundup Ready.  Roundup Ready seeds are genetically modified to resist glyphosate, or Roundup.

67.    By the year 2000, Roundup Ready seeds were planted on more than 80 million acres worldwide and nearly seventy percent (70%) of American soybeans were planted from Roundup Ready seeds.

68.    As the sales for Roundup Ready seeds proliferated, the sales for Roundup soared, accounting for almost $2.8 billion in 2000.

69.    As of 2015, Monsanto is the largest seed and herbicide supplier in the world with over $11.8 billion in yearly sales and a market valuation of $55.7 billion.

### D.    The Emergence of Super Weeds

70.    Due to the agriculture industry's over-reliance on glyphosate-tolerant crops, the constant spraying of Roundup and other herbicides on GM crops has led weed species to develop naturally-evolved resistances, causing the emergence of what weed scientists call "super weeds."

71.    Weed resistance is not a novel problem in the affected states.  Nearly all fifty (50) states have experienced some form, if not multiple forms of herbicide-resistant weeds.  *See* http://www.weedscience.com/Vmap/StateMap.aspx (last visited Jan. 18, 2017).

72.    Throughout the 1990s to the present day, ever increasing weed species have shown resistance to herbicides such as glyphosate.

73.    Ecologists call this the "pesticide treadmill," where weeds evolve to resist the chemicals designed to destroy them, forcing farmers to apply ever-higher doses or use a different pesticide.  This also forces herbicide producers to invent new herbicides to kill super weeds or reinvent new uses for older, more dangerous herbicides.

74.    As a direct result, as of 2015, over seventy (70) million acres of land in the United States contain Roundup-resistant weeds.

75.    In the U.S., where approximately ninety percent (90%) or more of all cotton, soybean, and corn crops consist of glyphosate-tolerant varieties, the acreage of farmland overrun with glyphosate-resistant weeds almost doubled between 2010 and 2012, from 32.6 million acres to 61.2 million acres.

76.    With the introduction of glyphosate-tolerant crops, the pattern of weed control has also changed from predominantly pre-plant applications of herbicides to mostly post-plant and in-season application practices.  This transformation has made herbicide drift and volatilization major concerns to crop producers of all kinds.

77.    In the affected states, super weeds are rampant, particularly where Palmer amaranth and waterhemp are significant problems.

78.    As correctly stated by Dr. Tom Barber, a University of Arkansas weed scientist, 2016 has been one of the worst years for Palmer amaranth in recent memory.

79.    Despite the causal link between Monsanto's Roundup products and the pervasive super weeds, Monsanto has done nothing to address this agricultural tsunami, but rather has continued to reap billions of dollars in profits from it.

**E.    Dicamba's Role**

80.    Dicamba was discovered in 1958 and has been on the market since 1967, first sold under the brand name, Banvel.

81.    Dicamba continues to be sold under a variety of older and existing brands, including Clarity, Diablo, Distinct, Marksman, Oracle, Status, Vanquish, and other generic names.

82.    Dicamba is a broad-spectrum, synthetic auxin herbicide that kills broad-leafed weeds, as opposed to eradicating plants in the grass family.

83.    Dicamba kills weeds before and after they sprout by increasing a plant's growth rate so the plant outgrows its nutrient supply and dies.

84.    Dicamba is therefore extremely toxic to virtually all broadleaf plants (plants that are not grasses), such as fruits, nuts, vegetables, and it is especially toxic to soybeans and cotton.

85.    For example, a healthy soybean plant will exhibit mature pods or beans throughout the entire stem of the plant, along with the appearance of healthy leaves – unless that plant has suffered damage, such as by dicamba.  Once damaged, the soybean plant will exhibit a profound loss of pods or beans throughout the height of the plant, along with cupped and discolored leaves, among other crippling symptoms.

86.    Visual damage from dicamba is not always evident.  Soybeans damaged early in the growing season will show typical leaf cupping and other symptoms.  But when soybeans are hit with dicamba at their flowering or reproductive or mature stages, the damage is harder to see, yet more yield loss will occur.

87.    As correctly stated by Dr. Larry Steckel, a weed extension specialist at the University of Tennessee, soybeans damaged by dicamba in the reproductive stages have a higher chance of significant yield loss.

88.     And as accurately stated by Dr. Kevin Bradley, an associate professor at the University of Missouri in the Division of Plant Sciences, a very small volume of dicamba, whether it be from drift or tank contamination, can lead to visual damage and yield loss in soybeans. *See* https://www.youtube.com/watch?v=GVrsku3xOOA (last visited Jan. 20, 2017).

89.     Dicamba was once used very little in American agriculture. According to data reported by Monsanto, just 3.8 million pounds of dicamba were applied to 25.3 million acres of cropland in 2011, representing just 0.9% of total agricultural herbicide use on 6.5% of the total cropland in the U.S. (390 million acres).

90.     As early as 2005, Monsanto sought to prolong the usefulness of its Roundup crop systems and revived dicamba, the active ingredient in VaporGrip, and began diligently developing a new crop system featuring dicamba to combat the super weed epidemic.

91.     Monsanto admits it has invested over $1 billion producing its new dicamba formula – not including nearly another $1 billion to upgrade and expand a dicamba manufacturing plant in Luling, Louisiana. The Luling plant is expected to open between 2019 and 2021.

92.     With the failure of Monsanto's Roundup Ready corn, soybean, and cotton seeds to battle the increasing infestation of super weeds in the affected states – and stepping away from its bread-and-butter Roundup products in the wake of the WHO linking glyphosate to cancer – Monsanto chose to release its new dicamba technology, i.e., Xtend soybeans and cotton, to renew not only the company's stranglehold on the market for weed control products, but to control the market well into the future.

93.     Monsanto is counting on the rapid adoption of its Xtend crops to boost earnings in its seed and pesticide units. In 2016, Monsanto sold about three (3) million acres of Xtend cotton and two (2) million acres of Xtend soybeans in the U.S.

94.     In 2017, Monsanto expects to sell over fifteen (15) million acres of Xtend soybeans and over three (3) million acres of Xtend cotton.  By 2019, Monsanto hopes to sell fifty-five (55) million acres of Xtend soybeans.  As dicamba-resistance is added to other crops, the Xtend technology may eventually cover 250 million acres.

95.     With all the dicamba being sprayed on Xtend crops in the U.S. since 2015, soybean and cotton farmers in the affected states who are not yet growing Xtend crops will have no choice but to purchase and grow Xtend crops by the 2017 growing season or else risk widespread destruction to their crops and the possibility of losing their livelihoods.

96.     As accurately stated by Dr. Tom Barber, discussing how farmers may be forced to purchase Xtend soybeans to protect themselves, "They're afraid that they're not going to be able to grow what they want to grow.  They're afraid that they're going to be forced to go with that technology."  *See* http://www.npr.org/sections/thesalt/2016/08/01/487809643/crime-in-the-fields-how-monsanto-and-scofflaw-farmers-hurt-soybeans-in-arkansas (last visited Jan. 22, 2017).

97.     In early 2009, Monsanto partnered with BASF, a German chemical company and the largest chemical producer in the world, and agreed to a joint licensing agreement to accelerate the development of dicamba-based weed control products.

98.     In the U.S., BASF Corporation, headquartered in Florham Park, New Jersey, is a subsidiary of BASF SE ("BASF"), and manufactures several dicamba herbicides, including Banvel, Clarity, Distinct, Marksman, Status, and a forthcoming product, Engenia.

99.     Monsanto and BASF also have an established research and development collaboration to develop technologies for farmers – yet both companies intend to individually launch their own dicamba-based crop systems and herbicides.

### F.    Monsanto Brings Dicamba to Market

100.    In April 2010, Monsanto made its first submission to the EPA to register dicamba for a new use of the herbicide with GM soybeans.

101.    In July 2010, Monsanto announced it had recently completed regulatory submission to the U.S. Department of Agriculture ("USDA") to deregulate its dicamba-tolerant soybeans. According to Monsanto's announcement:

> Dicamba is an ideal tank-mixing partner for Roundup® agricultural herbicides for both pre-plant and post-emergence weed control . . . Dicamba is an economical herbicide that provides excellent control for a wide spectrum of broadleaf weeds and ideally complements Roundup agricultural herbicides to provide another step change in soybean weed control.  This new technology would provide soybean farmers another low-cost weed management solution through the use of glyphosate, dicamba, or combinations of both.

102.    In November 2010, Monsanto and BASF stated they recently completed field testing of the dicamba-based herbicides.  In tests, the dicamba herbicides were applied over-the-top to Monsanto's Xtend products at Monsanto's research facility in Monmouth, Illinois.

103.    At least by 2012, weed scientists, agronomic crop growers, and specialty crop growers began warning consumers and growers alike of the danger of dicamba-resistant crops, including dicamba's propensity to drift onto sensitive, neighboring crops and how dicamba will accelerate the evolution of super weeds.

104.    Also in 2012, Monsanto submitted its petition to the EPA to register dicamba for in-crop use with cotton.

105.    In 2013, Monsanto submitted its application to deregulate dicamba for use with GM cotton.

106.    In June 2014,  BASF announced plans to boost production of its dicamba weed-killers by fifty percent (50%) to keep pace with anticipated demand should Monsanto receive regulatory approval to sell its new GM soybean and cotton products.

16

107.     Six months later, in January 2015, BASF's plan paid off when the USDA announced its decision (after a five-year investigation) to deregulate Monsanto's dicamba-tolerant crop technology for soybeans and cotton, authorizing the crops for unrestricted commercial planting.

108.     On December 21, 2016, BASF secured EPA approval for its dicamba herbicide, Engenia, for use on dicamba-tolerant soybeans and cotton.  Engenia will be available for the 2017 growing season.

### G.    The Sale and Distribution of Xtend Cotton Seeds in 2015

109.     For two (2) straight years, Monsanto exhibited intentional, reckless, and negligent behavior with the irresponsible and premature release of its Xtend crops on the market.  The first instance occurred in 2015 when Monsanto released its Xtend cotton seeds.

110.     In or around January 2015, Monsanto began the distribution and sale of its Xtend cotton in a limited commercial introduction in the United States, including the affected states.

111.     Through its distribution channel, Monsanto distributed and sold Xtend crops throughout the affected states to its national distributors, wholesalers, retailers, and other regional and local representatives and agriculture dealers and partners.

112.     Through Monsanto's distributors, wholesalers, and retailers, Xtend crops were distributed and sold to end-use customers, farmers, industrial users, and government agencies (such as highway departments) in the affected states.

113.     The distribution and sale of Monsanto's Xtend cotton seeds in 2015, however, was botched from the start, as it violated standard industry practice and ushered in a wave of reckless experimentation in farming communities in the affected states.

114.    According to researchers at the University of Missouri and the University of Arkansas, it is completely contrary to standard industry practice to release a new seed without the simultaneous availability of a corresponding herbicide – whether that corresponding herbicide already exists or is a new product.

115.    As correctly stated by Dr. Bob Scott, a weed specialist at the University of Arkansas Extension, to the Delta Farm Press in July 2016, "It's an odd situation because we can't recall a technology like this being released without a corresponding herbicide.  We had Roundup Ready, LibertyLink – none released without a herbicide."

116.    GM products such as Monsanto's are meant to be sold as a system.  Here, the system is both the Xtend seeds and VaporGrip.

117.    However, Monsanto sold only one (1) part of the system – the Xtend seeds – and failed to provide the VaporGrip herbicide, which makes the Xtend seeds inherently defective, dangerous, and destructive as marketed and as sold – as VaporGrip is indispensable to the system.

118.    Farmers in the affected states who purchased Xtend cotton in 2015 (and Monsanto's Xtend soybeans in 2016) did not have a complete system of products.  In other words, farmers were only sold half of a product system needed for the Xtend seeds to be used safely and effectively.

119.    Further, it is a violation of federal and state law to spray an herbicide off-label, i.e., make an in-crop application of any dicamba herbicide on Xtend cotton or soybeans.

120.    It has been established by the Arkansas Plant Board that a Monsanto representative told farmers to apply dicamba to its Xtend crops and over-the-top of the Xtend crops.  The Plant Board then sanctioned the farmers who Monsanto directed to illegally spray dicamba on its Xtend

crops.  *See*  http://www.arkansasmatters.com/news/local-news/working-4-you-illegal-chemical-use-damages-soybeans-threat-of-spread-outside-ag/521534160 (last visited Jan. 23, 2017).

121.    At all times relevant to this Complaint, there was no existing or current dicamba product approved for in-crop use on Xtend soybeans or cotton.  In fact, such a product was not approved until November 9, 2016, nearly two (2) years after Monsanto willfully and negligently released its Xtend seeds on the market.

122.    Because VaporGrip was not available for use with the Xtend crop system until November 9, 2016, it was reasonably foreseeable that farmers who grew Xtend seeds in the affected states would be forced to either: (a) apply dicamba on crops designed to resist dicamba and kill off super weeds or (b) watch their Xtend crops fail.

123.    Thus, during the 2015 growing season in the affected states, farmers improperly used and illegally sprayed older, more volatile, brand name, and generic versions of dicamba on Xtend cotton seeds that were not compatible, approved, or labeled for use with the seed.

124.    Further, Plaintiffs, who did not have or grow Xtend crops, had no way to protect themselves from farmers who grew Monsanto's Xtend crops and then sprayed dicamba herbicides in order to protect those crops.  But for Monsanto's tortious actions, these harms would not have occurred.

125.    And in 2015, Monsanto pushed its Xtend seeds onto the market in the affected states with full knowledge that there was no corresponding herbicide available for in-crop use, that it was foreseeable that farmers would spray dicamba on a seed designed to resist it, that dicamba was volatile and it would drift, that the Xtend seeds would eventually dominate the market, and that farming communities in the affected states would suffer massive destruction to their crops.

126.    Further, Monsanto's marketing and advertising materials for its Xtend products influenced and induced farmers in the affected states to purchase Xtend seeds.

127.    Monsanto tested its Xtend soybeans in 2015 with at least one (1) farmer in the affected states: Jim Moore of Lafayette County, Missouri, in the western half of the state – almost four hundred (400) miles away from Lilbourn, Missouri where Plaintiffs Landers and others similarly situated operate their farms.

128.    Due to its overwhelming greed, Monsanto rushed its Xtend cotton onto the market in a limited commercial introduction to entice farmers in the affected states to buy its Xtend cotton and soybeans in the future with complete, wonton disregard for the financial devastation that it would cause Plaintiffs.

**H**.    **Dicamba Damage in 2015**

129.    In 2015, the farmers and commercial applicators in the affected states who sprayed dicamba illegally were exponentially larger than the year before.  For example, in 2014, of the ninety (90) pesticide drift complaints made to the Missouri Department of Agriculture ("MDA"), only three (3) complaints were dicamba related.  Then in 2015, there were twenty-seven (27) dicamba-related pesticide complaints made to the MDA out of ninety-seven (97) total pesticide drift complaints.

130.    As accurately stated by Dr. Bill Robertson, an extension cotton agronomist for the Arkansas Division of Agriculture, two-thirds (2/3) of Arkansas' cotton acres were planted with Xtend in 2016.

131.    Monsanto's limited introduction of Xtend cotton in 2015 worked.  Monsanto boasted in a February 2016 press release that demand for their Xtend soybeans (for sale in 2016) was strong, highly anticipated by farmers, and there were "significant pre-orders from farmers."

132.     Damage to Plaintiffs in the affected states in 2015 from Monsanto's irresponsible, negligent, and premature release of its Xtend crops continued and was compounded in 2016.

## I.     The Sale and Distribution of Xtend Soybean Seeds in 2016

133.     In or around January 2016, Monsanto began the distribution and sale of its Xtend soybeans in the affected states with expectations to corner the soybean market.

134.     As soybeans are the second most widely-grown crop in the United States after corn, Monsanto's ability to dominate the soybean market will result in massive financial gain.

135.     In order to entice farmers to purchase Xtend seeds in the affected states, Monsanto lowered the price of its Xtend soybeans, allegedly to offset the lack of herbicide availability, but also as a means to ensure that its Xtend seeds flooded the market.

136.     Monsanto, at all times, was motivated by greed and a desire to make its Xtend products the dominant seed on the market.

137.     In 2016, the distribution and sale of Monsanto's Xtend soybeans in the affected states once again violated standard industry practice and created a destructive wave of crop death via reckless experimentation, as farmers in the affected states who purchased and planted Xtend soybeans did not have access to its corresponding herbicide.

138.     On February 3, 2016, Monsanto announced its commercial launch plans for its Xtend soybeans after the GM seed received import approval from China.  But Chinese import approval did not impact or expedite VaporGrip's regulatory approval by the EPA or the prospect of Monsanto releasing the entire Xtend crop system.

139.     Kim Magin, Director of Industry Affairs for Monsanto, told the Delta Farm Press on April 15, 2016, "[O]ur best guess is having dicamba formulations ready for growers is unlikely for this year.  We have our fingers crossed that the approval will come as quickly as possible so

growers, without further delay, will be able to use this new tool in soybean and cotton production in 2017."

140.    However, Monsanto never told farmers not to plant Xtend crops and never warned farmers, commercial applicators, state legislatures, or third parties who might be harmed about the dangers of dicamba drift.

141.    Monsanto also sold its Xtend soybeans and cotton seeds direct to larger commercial farms.

142.    In May 2016, grain elevators and companies in the U.S. planned to reject Monsanto's Xtend soybeans because Monsanto had not secured import approval from the European Union ("EU").   Also, Monsanto was criticized by grain trade associations for its unacceptable and troubling actions with respect to Xtend soybeans.

143.    Other worries about Xtend soybeans surfaced in May 2016 when oilseed advisors recommended against planting Monsanto's Xtend soybeans until the company received import approval from the EU.

144.    In response, Monsanto allowed farmers to trade or cancel orders for Xtend soybeans with certain charges waived.

145.    Even with the numerous issues and concerns surrounding its Xtend crop system in 2016, Monsanto proceeded with a full commercial launch of its Xtend seeds.

146.    With Monsanto hurrying its Xtend seeds onto a broader market with full knowledge that there was no corresponding herbicide available for in-crop use, it was completely foreseeable and inevitable that farmers in the affected states would spray dicamba on a seed designed to resist it, that dicamba was volatile and it would drift, that the Xtend seeds would eventually dominate

the market, and that farming communities in the affected states would suffer destruction to their crops.

147.    Thus, during the 2016 growing season in the affected states, farmers predictably used and illegally sprayed older, more volatile, brand name, and generic versions of dicamba on Xtend soybeans that were not compatible, approved, or labeled for use with the Xtend seeds.

148.    In comparison, Syngenta AG, a global Swiss agribusiness that produces agrochemicals and seeds and who licenses the Xtend technology, behaved responsibly by refusing to sell any soybeans containing the dicamba-trait in 2016.  Syngenta AG will sell its Xtend seeds in 2017.

149.    Further, Plaintiff Steve Landers was told by Bob Balier at QMI Fertilizer & Grain, Inc. ("QMI") in Parma, Missouri, that Dupont Pioneer ("Pioneer") – an international seed company located in Johnston, Iowa – told QMI to ship all of Pioneer's dicamba soybeans back to Pioneer.

150.    As of June 2016, with the comment period for the EPA's proposed dicamba label having closed on May 31, the EPA failed to approve VaporGrip for the 2016 growing season.

151.    In July 2016, Monsanto received import approval from the EU.

152.    The overall, alleged advantage of Monsanto's Xtend soybeans, however, has been met with skepticism in the agricultural community.  2016 test trials by weed extension programs at the University of Minnesota and the University of Wisconsin did not find any significant yield increase for Monsanto's Xtend soybeans.  In field trials, Xtend soybeans tended to yield a bushel or two (2) lower on average.  *See* http://blog-crop-news.extension.umn.edu/2016/10/u-of-m-se-minnesota-dicamba-tolerant.html          (last          visited          Jan.          18,          2017); http://ipcm.wisc.edu/blog/2016/11/new-traits-dont-automatically-translate-to-highest-yield/ (last visited Jan. 18, 2017).

153.    These scientific results stand in stark contrast to statements made by Miriam Paris, Monsanto's U.S. Soybean Marketing Manager, in July 2016, where she claimed that the higher yield potential for Xtend soybeans factored into the company's decision to commercialize the seeds in 2016, despite the absence of an approved dicamba-based herbicide for use in-crop at that time.  Ms. Paris stated the Xtend soybeans allegedly offer a two and a half (2½) to seven (7) bushel-per-acre yield advantage above Roundup Ready 2 Yield varieties.

154.    Also in 2016, Monsanto ran an advertisement for its Roundup Ready 2 Xtend soybeans with their Asgrow seed brand.  The advertisement claims, "The Fields Was Spotless," and provides a quote from Steve Minner, a corn and soybean farmer in Morley, Missouri, who states in the advertisement: "I was able to spray dicamba on my Asgrow Roundup Ready 2 Xtend production acres this season and the field was spotless.  I can't wait for dicamba to receive regulatory approvals to help control tough pigweed."

155.    In fact, in August 2016, the EPA issued a Compliance Advisory due to the unusually high number of reports of crop damage related to the misuse of herbicides containing dicamba.  *See*  https://www.epa.gov/compliance/compliance-advisory-high-number-complaints-related-alleged-misuse-dicamba-raises-concerns (last visited Jan. 18, 2017).

156.    As accurately stated by Dr. Larry Steckel, the weather and growing conditions in the Mid-South in 2016 created the perfect storm for dicamba injury to crops.

157.    And as independent weed consultant, Dr. Ford Baldwin correctly stated to DTN/The Progressive Farmer in July 2016 when commenting on the first reports of off-target and off-label dicamba use, "It looks like a bomb went off in some parts of the South."

158.    The full consequences of Monsanto's actions will not be known until several months into 2017, but regulatory officials in several of the affected states cite a ballpark figure of

24

200,000 affected acres of various crops, produce, and ornamentals in Arkansas, Tennessee, and Missouri, thus far.

**J.    Dicamba Damage to Plaintiffs Landers in 2016**

159.    For Plaintiffs Landers, the 2016 growing season began well with a good planting season, no disruptive rainfall, and favorable weather.

160.    Plaintiffs Landers planted half of their soybean and corn crop in May 2016 and planted the other half of their crops in the first week of June 2016.

161.    For soybeans, Plaintiffs Landers and others similarly situated grow Roundup Ready seeds that are not dicamba-tolerant.

162.    Like others similarly situated, Plaintiffs Landers' farms and crops are located near farms and fields that were planted with Xtend cotton and soybeans.

163.    Plaintiffs Landers have reason to believe that nearby farmers who purchased Monsanto's Xtend soybeans and/or cotton seeds sprayed their crops with older dicamba over-the-top on or about June 1, 2016.  Plaintiffs Landers also provided a list of names of farmers to the MDA that Plaintiffs Landers believed applied dicamba to Xtend crops that caused injury to Plaintiffs Landers' soybeans and corn.  The MDA responded to Plaintiffs Landers that some of the names they provided were on a list of individuals that the MDA had  spoken to and collected field samples from their fields.

164.    Typically, it takes ten (10) to fourteen (14) days for the symptoms of dicamba injury to reveal itself in sensitive crops.

165.    On or about June 10, 2016, Plaintiff Landers saw the first signs of dicamba damage to their soybeans.  Plaintiffs Landers saw curled and cupped leaves on their soybeans, burnt edges, aborted pods, and the bottom halves of soybean plants did not produce any soybean pods.

166.    Also at this time, Plaintiffs Landers' corn crop showed signs of dicamba damage, including smaller corn ears and burnt edges.

167.    During this time, the MDA received over 124 formal complaints of pesticide drift, alleging damage across more than 44,000 acres to soybeans, corn, peaches, tomatoes, watermelons, cantaloupe, rice, purple-hull peas, peanuts, cotton and alfalfa, as well as to residential gardens, trees, and shrubs.

168.    The vast majority of the MDA pesticide drift complaints occurred between June 22, 2016 and the first week of August 2016, and were concentrated within a four (4) county region of Dunklin, New Madrid (where Plaintiffs Landers operate their farms), Pemiscot, and Stoddard Counties.

169.    As accurately stated by MDA, yearly pesticide complaints are typically split evenly between farmers and commercial applicators.   In 2016, however, the majority of pesticide complaints were against farmers.

170.    On July 1, 2016, Plaintiffs Landers noticed dicamba damage to their second crop that was planted during the first week of June 2016.   These soybean and corn crops were hit with dicamba drift at an especially fragile stage of growth, during their flowering or reproductive stage, thus destroying the bulk of Plaintiffs Landers' soybean and corn crops.

171.    All of Plaintiffs Landers' farms, like others similarly situated, were damaged by dicamba, thereby inflicting a broad range of damage to their crops.

172.     Plaintiffs Landers' sweet corn was also damaged by dicamba.  The sweet corn quit growing and Plaintiffs Landers could not pick any of it.

173.    Also, Plaintiffs Landers saw damage to their home garden, as dicamba killed their strawberries, tomatoes, squash, and zucchini.

26

174.    Despite noticing the tell-tale signs of dicamba damage to their crops in June and July of 2016, Plaintiff Steve Landers was initially unaware of the cause of such widespread damage.

175.    In response to the damage, Plaintiffs Landers, like others similarly situated, spent thousands of dollars on expensive applications of fertilizer, fungicides, and insecticides to nurse their crops back to health.  But these remedial efforts proved futile as the dicamba damage continued and Plaintiffs Landers' crops continued to suffer irreparable damage.

176.    By July 2016, Plaintiffs Landers no longer saw prosperous yields for their crops due to the continued tell-tale signs of dicamba damage wiping out their non-dicamba-tolerant crops.

177.    By the end of July 2016, Plaintiffs Landers' soybean crop had been reduced by almost thirty (30) bushels per acre due to dicamba damage.

178.    Plaintiffs Landers' corn crop was also damaged by dicamba.  Some cornfields that normally produced around 190 bushels per acre were reduced to 130 bushels per acre; while other cornfields that normally produced 150-160 bushels per acre were down to 100 bushels per acre.

179.    As of November 2016, Plaintiffs Landers also saw a reduction of over twenty-percent (20%) in their corn yield.

180.    Across all of their farms by the end of the 2016 growing season, Plaintiffs Landers saw a thirty-five percent (35%) to fifty percent (50%) loss in their crop yields due to dicamba.

181.    Additionally, Plaintiffs Landers and others similarly situated saw the dicamba damage occurring on other nearby farms.

182.    Plaintiff Steve Landers noticed how clean some of his neighboring farmer's fields were – free of pigweed, which is so pervasive in Southeast Missouri – and he suspected they had sprayed dicamba over-the-top of their Xtend crops.

183.    Further, Plaintiff Steve Landers began having conversations with his neighbors about what was happening to their dicamba damaged crops.

184.    Plaintiff Steve Landers also complained to employees at QMI about the damage being done to his crops by dicamba.

185.    On October 11, 2016, Plaintiffs Landers filed a pesticide incident report with the MDA.

186.    Plaintiffs Landers filed their pesticide complaint late in the 2016 growing season based on their initial confusion as to what was happening to their crops, despite seeing but not recognizing the signs of dicamba damage.

187.    In their complaint, Plaintiffs Landers stated they experienced a fifty percent (50%) reduction in their harvested crop with dicamba damage affecting upwards of 765 acres.

188.    And with 2016 crop prices at multi-year lows, the financial losses to Plaintiffs Landers and others similarly situated only multiplied.

### K.    Reaction to Dicamba Drift

189.    There is a growing fear of what will happen to farmers in the affected states, including Plaintiffs, when Monsanto's XtendiMax is unleashed full-scale on the market because farmers and applicators spraying dicamba will increase exponentially.

190.    Because of the widespread damage to crops in the affected states, and because of Monsanto's inaction and near indifference to the damage it caused by putting its Xtend products on the market, a media firestorm began, causing negative publicity for Monsanto.  National media

outlets across the nation, including the Wall Street Journal, National Public Radio, Mother Jones, ecowatch.com, Bloomberg, and DTN/The Progressive Farmer, picked up the story, as did numerous local media in the affected states.

191.    In light of the widespread damage and complaints by farmers in the affected states, on July 29, 2016, the University of Missouri Extension held a Dicamba Crop Injury Forum to share and gather information on the dicamba damage.

192.    The forum, held at the Fisher Delta Research Center in Portageville, Missouri, was organized in response to the devastation, the mass outrage, and the growing concerns of farmers and citizens, including Plaintiffs.  More than 130 people attended.

193.    Throughout the summer of 2016, as evidence of crop damage caused by dicamba continued to escalate, concerns in and among the agricultural community increased.  The evidence of dicamba damage was real and widespread, so much that federal and state governments got involved.

194.    The EPA is continuing investigations throughout the country, including throughout the affected states, on the misuse and misapplication of dicamba on Xtend crops.

### L.    Missouri Special Hearing on Dicamba

195.    On August 31, 2016, the Missouri House Select Committee on Agriculture ("Committee on Agriculture") held a special hearing at the Fisher Delta Research Center in Portageville, Missouri in an effort to gather information and assess the problem and ramifications of dicamba and its impact on sensitive crops.

196.    Members of the Committee on Agriculture in attendance at the special hearing were: Chairman Representative ("Rep.") Bill Reibolt, Rep. Tracy McCreery, Rep. Sonya Anderson, Rep. Mike Bernskoetter, Rep. J. Eggleston, Rep. Jay Houghton, Rep. Sue Meredith,

Rep. Tommie Pierson, Rep. Craig Redmon, and Rep. Don Rone. Also in attendance at the special hearing was Missouri Speaker of the House, Rep. Todd Richardson.

### (1)    Testimony of Monsanto

197.    Testimony at the special hearing began with Duane Simpson speaking on behalf of Monsanto. Mr. Simpson leads Monsanto's state and local government affairs team.

198.    Mr. Simpson outlined the history of dicamba and Monsanto's efforts to gain EPA approval for its allegedly "cost-effective" VaporGrip.

199.    Further, Mr. Simpson discussed the causes of off-target dicamba movement, including spray drift, volatilization, and chemical contamination. He admitted that Monsanto identified spray drift as the number one, overwhelming cause of dicamba's off-target movement.

200.    Mr. Simpson admitted Monsanto has undertaken several large-scale drift trials across the country to conduct research on dicamba drift.

201.    Mr. Simpson stated VaporGrip has a low volatility and numerous application restrictions.

202.    Mr. Simpson alleged Monsanto's testing shows that VaporGrip will have two percent (2%) of the relative volatility of older dicamba formulations.

203.    Mr. Simpson admitted Monsanto plans to offer VaporGrip to farmers and applicators, but had not yet done so.

204.    Mr. Simpson stated that Monsanto would not host its first academic symposium on its new dicamba products until the end of 2016.

205.    Mr. Simpson also admitted:

> a)    General training with dealers, applicators, and numerous farmers on Monsanto's VaporGrip and Xtend products cannot begin until the EPA releases a final label for VaporGrip;

b) The critical time for herbicide training is in the fall – the same period of time when Monsanto hoped to have final label approval to begin their dicamba product training program;

c) With the Xtend soybean and cotton on the market for the last two (2) years, Monsanto did not want to train specifically on how to use dicamba in-crop because it was illegal at the time;

d) Monsanto has been waiting six and a half years (6½) for label approval, which is five (5) years beyond what Monsanto anticipated;

e) The first and most important next step for Monsanto is to receive a label from the EPA; and

f) Monsanto is concerned about the damage they have seen from "the alleged illegal misuse of pesticides."

206.    According to Mr. Simpson, it was Monsanto's expectation that they "would have [VaporGrip] available" by Spring 2017.

207.    "We can't sell the chemistry to retailers until the label is done," Mr. Simpson stated. "There is an urgency for training on the final label."

### (2)    Testimony of the Missouri Department of Agriculture

208.    Up next to testify at the special hearing was Judy Grundler, Director of the Plant Division with the MDA.  Ms. Grundler stated her department began receiving complaints on June 22, 2016 in a four (4) county area in Southeast Missouri.  Within this area, the MDA received over 140 pesticide/dicamba complaints, including a few dicamba complaints from Butler and Carroll Counties.

209.    Ms. Grundler discussed the time and financial investments required to fully investigate a pesticide complaint, which can take months and requires certified laboratory testing.  Ms. Grundler also commented on the low civil penalty in Missouri for violations of the Missouri Pesticide Use Act.

210.    Ms. Grundler stated that a different seed and herbicide company chose not to release its GM seeds in Missouri.

211.    Further, Ms. Grundler stated that Monsanto released its Xtend seeds because Monsanto had received import approval from China for the seeds in January 2016.

(3)    **Testimony of Dr. Kevin Bradley**

212.    Dr. Kevin Bradley also testified at the special hearing.  In addition to his position at the University of Missouri, Dr. Bradley has been a state Extension Weed Scientist for the past thirteen (13) years.

213.    During his testimony, Dr. Bradley recalled the steady stream of pesticide complaints that came into the MDA in June 2016 – up to eight (8) to ten (10) calls per day.

214.    Dr. Bradley noted Monsanto has done research on Xtend soybeans since 2006 and there is a lot of data on the seed regarding its weed control capability.

215.    However, Dr. Bradley testified there has been concern from "day one" about bringing a product to market that will be sprayed with dicamba.  Tomatoes, tobacco, peach trees, and soybeans that are not dicamba resistant will be negatively impacted.

216.    And despite the application protections suggested by VaporGrip's then-pending label, Dr. Bradley testified he is not confident those protections will work because not enough research has been done.  "This new formulation is not going to solve everything," he said.

217.    Dr. Bradley stated, "We just experienced an experiment in Missouri, Arkansas, and Tennessee as to what could occur with dicamba once it gets out there on a larger basis."

218.    According to Dr. Bradley's testimony, by 2017, soybean farmers will have no choice but to plant Xtend soybeans simply to protect themselves.  "Soybeans are incredibly

sensitive to dicamba," he said.  Farmers will effectively be left with only one soybean seed they can plant if they want to continue in the farming industry.

219.    Dr. Bradley testified that research on VaporGrip has been done only from a weed control standpoint.  No university researcher has been allowed to evaluate its volatility.

220.    Dr. Bradley further expressed his frustration with the limitations placed on university researchers by companies like Monsanto that want to protect their patents and technology.  Because of this, Dr. Bradley and other independent researchers are never able to test dicamba-based herbicides, such as VaporGrip, or study their impact.

221.    Dr. Bradley also explained how temperature inversions factor into the dicamba damage.  Between the months of June and July in Southeast Missouri, there are temperature inversions that last between eight (8) to ten (10) hours, mostly in the evenings and overnight.  The more humidity there is, the hotter the temperatures rise, and more volatility occurs in these herbicides.

222.    Dr. Bradley stated he has also spoken to a farmer who sprays pesticides at ten o'clock (10:00) at night, directly into a temperature inversion where the pesticide can literally move miles away.

223.    Further, despite herbicide labels warning against spraying in a temperature inversion, whether or not farmers know what a temperature inversion is or means or looks like is an additional concern.

224.    Finally, Dr. Bradley answered the ultimate question posed by the dicamba problem: Is it normal practice for a GM seed to hit the market without an approved, corresponding herbicide? "No," Dr. Bradley testified.  "Many have said and I would agree that is part of the problem.  We have a trait without [a] corresponding herbicide to go with it.  Allegedly, a certain number of

farmers have said, 'I'm gonna spray the old herbicide because I have this trait out here [in the fields] and you won't give me the new stuff.' "

225.    As accurately stated by Dr. Bradley to DTN/The Progressive Farmer, because some farmers do not like to turn in other farmers, approximately 100,000 acres of soybeans were damaged in Missouri alone in 2016, to say nothing of the acreage damaged in the other affected states.

### (4)    More Testimony from Southeast Missouri Farmers

226.    A number of other local farmers in Southeast Missouri also testified before the committee regarding their experiences and difficulties with dicamba.

227.    Ellis Sapp, a soybean farmer from Mississippi County, Missouri testified he and his father farm over 3,200 acres of soybeans.  Every acre of their soybeans had been hit with drift, damaging about 1,700 acres of soybeans.

228.    Most of the Sapp's soybeans were hit early in the growing season with pesticide and dicamba drift, Mr. Sapp said.  The Sapp's crops are planted near or around Xtend cotton fields.

229.    Mr. Sapp testified that one of the reasons Monsanto put its Xtend seeds on the market was because farmers wanted the technology to increase their crop yields by six (6) to ten (10) more bushels per acre.

230.    Mr. Sapp testified that his 2016 crop yield for his non-Xtend soybeans should have been seventy (70) to eighty (80) bushels per acre, but he estimated he would only get between twenty-five (25) and forty (40) bushels per acre due to damage from dicamba.  "It's not good.  I mean it's pretty bad for some of us," he said.

231.    Eddie Bowman from Stoddard County, Missouri also testified.  Mr. Bowman grows forty (40) acres of cotton.  In 2016, he grew Xtend cotton.  Mr. Bowman, who did not state whether

or not he used dicamba on his crop, testified he has chopped his cotton (removed weeds) three (3) times in 2016. Mr. Bowman's neighbor behind him, however, who plants 640 acres of Xtend cotton has not chopped once. "So it's pretty clear what he's using," Mr. Bowman said. He also testified he suffered dicamba damage to 250 acres of soybeans, and that his soybean yield would drop to twenty (20) bushels per acre.

232. The final farmer to testify at the special meeting was Joe Woolverton from New Madrid County, Missouri. Mr. Woolverton grows 2,000 acres of soybeans. Every field that he grows was damaged by pesticide drift.

### M. Meetings in Other Affected States

233. The meetings at the Fisher Delta Research Center in Missouri are not unique. These sorts of meetings and hearings are happening throughout the country in the affected states.

234. On July 25, 2016, the Arkansas Plant Board met in Little Rock, Arkansas, to review policies on dicamba and 2,4-D. The Plant Board accurately anticipated a large turnout, so it made room for overflow.

235. Sworn testimony has established that Monsanto's representatives made a practice of directing farmers who purchased its Xtend seeds to illegally spray dicamba to protect their crops.

236. At the July 25 meeting, the Arkansas Plant Board also discussed banning Monsanto's XtendiMax herbicide altogether, in addition to other restrictions such as requiring proper testing by university researchers for Monsanto's VaporGrip, a ban on all applications of DMA salt or acid formulations of dicamba, buffer zones between dicamba-treated fields and non-dicamba fields, and cut off dates for pesticides that contain dicamba. The committee also

considered ways to regulate seed systems by making sure the proper pesticide is purchased with the seed.

237.    On November 21, 2016, the Arkansas Plant Board held a three-hour public hearing on the proposed XtendiMax ban.  One hundred and sixty people (160) attended this meeting and twenty (20) people testified.   Several farmers testified about the damage they suffered from dicamba:

   a) Reed Storey, a Marvell, Arkansas, farmer, testified that he and his father had approximately 600 acres of soybeans that they could visually identify as damaged by dicamba gone astray, estimating a $70,000 loss of income; and

   b) Tim Roberts, Ozark Mountain Poultry, based in Rogers, Arkansas, said his company is already receiving significant pushback from growers who have traditionally supplied them non-GMO soybeans for a premium.  "Producers fear neighbors will use off-label products and they need to plant Xtend soybeans as a defensive move."

238.    Also at the November 21 hearing, the Arkansas Plant Board unanimously passed a rule to ban the use of XtendiMax in the state.  In advance of the hearing the Plant Board received 245 comments that overwhelmingly favored harsh restrictions on dicamba products with 192 comments in support, thirty-three (33) requests for a ban of all dicamba products, and only five (5) comments opposing the restrictions.

239.    On January 4, 2017, Arkansas Governor, Asa Hutchinson, sent a letter to the chairman of the Arkansas State Plant Board approving the board's proposed amended regulation to ban Monsanto's XtendiMax, pursuant to Executive Order.

240.    On January 17, 2017, an Arkansas legislative panel signed off on the Plant Board's XtendiMax ban and its other restrictions for dicamba-based herbicides.

241.    In support of this new "Dicamba rule," Terry Walker, Director of the Arkansas Plant Board, noted that Monsanto did not make XtendiMax available for third-party study.  Mr.

Walker said Plant Board members would be happy to make it their policy that Monsanto make its herbicide available for study. "The Plant Board, in essence, was working blind with a limited amount of data," he said.

242.    Mississippi has also proposed rules to reduce the aerial spraying and wind speed allowance for XtendiMax and other dicamba herbicide applications.

## N.    Monsanto's Denials

243.    During and after the deluge of pesticide drift complaints in the affected states and the ravaging of Plaintiffs' farming operations from dicamba, Monsanto has consistently denied any wrongdoing for the negligent release of its Xtend crops.

244.    On August 1, 2016, for example, Dan Urnikis, Industry Affairs Lead, and Kyel Richard, Product Communications Lead for Monsanto, were asked by a reporter from the Delta Farm Press about the premature sale and distribution of Xtend cotton and soybeans without a corresponding dicamba formulation. Dan Urnikis responded, as follows:

> [A]t this time, there is no approved chemistry over-the-top for the Xtend crop system . . . We've been developing soybean varieties for several years in anticipation of a full regulatory approval. That process takes several years and we've had continued delays. Our best products continue to sit on the shelf . . . So, farmers tell us they'd prefer to try new varieties on their farm for small quantities in initial years to see which work on their farms the best. We chose to launch this year to allow growers to experience the industry-leading varieties of [Xtend] soybeans. They can plant with confidence this year in anticipation of the chemical approval for the 2017 growing season . . . We thought it important for growers to get the opportunity to experience the new technology while really understanding the requirements and expectations for farmers to follow the label when applying herbicides on their farms . . . Pending regulatory approval, [2017] we'll be out with a Roundup Ready <u>cropping system</u> that features the VaporGrip . . . (emphasis added).

245.    When asked by the Delta Free Press if Monsanto had a position on the growers who illegally sprayed dicamba off-label on their Xtend products, Urnikis stated, "We understand the EPA is investigating and Monsanto is supporting that work."

246.     To the same question, Kyel Richard doubled down on Monsanto's abdication of responsibility by stating, "The thing I want to underline is we, as a company, aren't an enforcement agency . . . As a company, we can't speculate on what action government officials will take – especially those who are investigating complaints of misuse . . . It's very important to note that [Monsanto] doesn't manufacture any dicamba products . . . it isn't our [dicamba] products being used."

247.     On or about August 2, 2016, Philip Miller, Vice President of Global Regulatory Affairs for Monsanto, stated to The Wall Street Journal that Monsanto does not manufacture older versions of dicamba, and apparently, therefore, accepts no responsibility.

248.     On or about August 3, 2016, Miriam Paris of Monsanto stated to DTN/The Progressive Farmer, "We've been developing Xtend soybeans for over a decade . . . At what point do we not bring forward these really strong genetics."

249.     Then on August 4, 2016, Monsanto released a statement by Miriam Paris titled, "Monsanto Statement on Reports Alleging Illegal Dicamba Use."  The statement included a familiar-by-now message, among other statements:

> Earlier this year [2016], we introduced part of a new system for soybeans called Roundup Ready 2 Xtend," where, "farmers were able to test out the new soybean seeds . . . Even without the ability to use dicamba this year, our new Roundup Ready 2 Xtend soybeans contain our latest and greatest germplasm, which can help farmers produce their best possible crop . . . Reports alleging that some applicators are illegally using dicamba are concerning . . . We remain very optimistic about the future of dicamba. (emphasis added).

### O.     Plaintiffs Landers' Crop Yields & Sales from 2011 to 2015

250.     The future for Plaintiffs Landers' farming operation does not appear very optimistic.

251.     From 2011 to 2014, Plaintiffs Landers planted soybeans, corn, and cotton.

252.    Also from 2011-2014, soybean and corn prices averaged roughly as follows:

    a) Soybeans:    $12.26; and
    b) Corn:    $5.29.

253.    In 2011, Plaintiffs Landers planted 914 acres of soybeans and corn, in addition to cotton, as follows:

    a) Soybeans:    285 acres; and
    b) Corn:    629 acres.

254.    Of those planted acres in 2011, Plaintiffs Landers saw the following yields:

    a) Soybeans:    58 bushels per acre; and
    b) Corn:    158 bushels per acre.

255.    Also in 2011, Plaintiffs Landers' crops endured major spring flooding that damaged their corn, thirty percent (30%) of which they had to replant.  The flooding also made Plaintiffs Landers plant their soybeans late, and yield losses can occur with replanting or planting late.

256.    It is also Plaintiffs Landers' custom to store some of their harvested crops and carry those stored crops over into the following year to be sold.

257.    In 2011, Plaintiffs Landers' total sales of $1,137,336.54 consisted of the following:

    a) Soybeans carried over from 2010:    $0
    b) Corn carried over from 2010:    $217,135.05;
    c) Cotton carried over from 2010:    $89,883.96;
    d) Soybeans:    $65,484.66;
    e) Corn:    $239,263.18; and
    f) Cotton:    $525,619.24.

258.    Thus, in 2011, Plaintiffs Landers' sales from their soybean and corn harvests were (including soybeans and corn from 2011 carried over for sale in 2012):

    a) Soybeans:    $133,521.08; and
    b) Corn:    $380,981.31.

259.    In 2012, Plaintiffs Landers planted 858 acres of soybeans and corn, in addition to cotton, as follows:

     a) Soybeans:     328 acres; and
     b) Corn:     530 acres.

260.     Of those planted acres in 2012, Plaintiffs Landers saw the following yields:

     a) Soybeans:     63 bushels per acre; and
     b) Corn:     181 bushels per acre.

261.     Also in 2012, Plaintiffs Landers had good weather and growing conditions.

262.     In 2012, Plaintiffs Landers' total sales of $913,035.30 consisted of the following:

     a) Soybeans carried over from 2011:     $68,036.42;
     b) Corn carried over from 2011:     $141,718.13;
     c) Cotton carried over from 2011:     $64,231.72;
     d) Soybeans:     $72,285.90;
     e) Corn:     $242,294.41; and
     f) Cotton:     $324,468.72.

263.     Thus, in 2012, Plaintiffs Landers' sales from their soybean and corn harvests were (including soybeans and corn from 2012 carried over for sale in 2013):

     a) Soybeans:     $201,397.97; and
     b) Corn:     $460,436.89.

264.     In 2013, Plaintiffs Landers planted 1,060 acres of soybeans and corn, in addition to cotton, as follows:

     a) Soybeans:     373 acres; and
     b) Corn:     687 acres.

265.     Of those planted acres in 2013, Plaintiffs Landers saw the following yields:

     a) Soybeans:     51 bushels per acre; and
     b) Corn:     205 bushels per acre.

266.     Also in 2013, Plaintiffs Landers saw flood damage to their soybean crop due to fifteen (15) inches of rain in the first ten (10) days of August, harming 150 to 160 acres of soybeans that did not recover.

267.     In 2013, Plaintiffs Landers' total sales of $930,687.45 consisted of the following:

    a) Soybeans carried over from 2012:    $129,112.07;
    b) Corn carried over from 2012:    $218,142.48;
    c) Cotton carried over from 2012:    $71,445.37;
    d) Soybeans:    $91,085.22;
    e) Corn:    $238,623.70; and
    f) Cotton:    $185,288.61.

268.    Thus, in 2013, Plaintiffs Landers' sales from their soybean and corn harvests were (including soybeans and corn from 2013 carried over for sale in 2014):

    a) Soybeans:    $179,400.94; and
    b) Corn:    $415,877.18.

269.    In 2014, Plaintiffs Landers planted 889 acres of soybeans and corn, in addition to cotton, as follows:

    a) Soybeans:    321 acres; and
    b) Corn:    568 acres.

270.    Of those planted acres in 2014, Plaintiffs Landers saw the following yields:

    a) Soybeans:    62 bushels per acre; and
    b) Corn:    188 bushels per acre;

271.    Also in 2014, Plaintiffs Landers endured a spring freeze to their crops and had to replant 300 acres of corn.

272.    In 2014, Plaintiffs Landers' total sales of $800,896.51 consisted of the following:

    a) Soybeans carried over from 2013:    $88,315.72;
    b) Corn carried over from 2013:    $177,253.48;
    c) Cotton carried over from 2013:    $47,244.92;
    d) Soybeans:    $141,255.15;
    e) Corn:    $150,481.06; and
    f) Cotton:    $196,346.18.

273.    Thus, in 2014, Plaintiffs Landers' sales from their soybean and corn harvests were (including soybeans and corn from 2014 carried over for sale in 2015):

    a) Soybeans:    $200,414.94; and
    b) Corn:    $275,283.09.

274.    In 2015 and 2016, Plaintiffs Landers did not plant cotton.  This resulted in a sizeable increase in Plaintiffs Landers' planted acres for soybeans and corn in 2015 and 2016.

275.    Also in 2015, soybean and corn prices per bushel averaged roughly as follows:

    a)  Soybeans:      $8.12; and
    b)  Corn:          $3.60.

276.    In 2015, Plaintiffs Landers planted 1,552 acres of soybeans and corn, as follows:

    a)  Soybeans:      807 acres; and
    b)  Corn:          745 acres.

277.    Of those planted acres in 2015, Plaintiffs Landers saw the following yields:

    a)  Soybeans:      63 bushels per acre; and
    b)  Corn:          182 bushels per acre.

278.    2015 was also a good growing season for Plaintiffs Landers with favorable weather.

279.    In 2015, Plaintiffs Landers' total sales of $650,804.00 consisted of the following:

    a)  Soybeans carried over from 2014:      $59,159.79;
    b)  Corn carried over from 2014:          $124,802.03;
    c)  Cotton carried over from 2014:        $52,949.79;
    d)  Soybeans:                             $256,620.38;
    e)  Corn:                                 $146,851.58; and
    f)  Cotton:                               $0.

280.    Thus, in 2015, Plaintiffs Landers' sales from their soybean and corn harvests were (including soybeans and corn from 2015 carried over for sale in 2016):

    a)  Soybeans:      $256,620.38; and
    b)  Corn:          $290,141.57.

**P.    Damage to Plaintiffs Landers in 2016**

281.    In 2016, Plaintiffs Landers and others similarly situated saw dicamba damage to one hundred percent (100%) of their crops, impacting over 700 acres of soybeans and over 500 acres of corn.  More than half of Plaintiffs Landers' soybean crop was also destroyed by dicamba in 2016, and the totality of their losses will not be fully known until further into 2017.

42

282.    In 2016, Plaintiffs Landers planted 1,462 acres of soybeans and corn (similar to 2015 when Plaintiffs Landers did not plant any cotton), as follows:

      a)  Soybeans:     737 acres; and
      b)  Corn:         755 acres.

283.    Despite planting more acreage in 2016 than they had in years prior, excluding 2015, Plaintiffs Landers saw their yields for soybeans and corn drop precipitously.

284.    Of those planted acres in 2016, Plaintiffs Landers saw the following yields:

      a)  Soybeans:     36 bushels per acre; and
      b)  Corn:         150 bushels per acre.

285.    2016 was another good growing season for Plaintiffs Landers' crops with more favorable weather.

286.    In 2016, Plaintiffs Landers' total sales of $423,636.99 was lower than in years past due to the dicamba damage, no soybeans carried over from 2015, and a lack of planting and selling cotton, as follows:

      a)  Soybeans carried over from 2015:    $0;
      b)  Corn carried over from 2015:        $143,289.99;
      c)  Cotton carried over from 2015:      $0;
      d)  Soybeans:                         $189,140.30;
      e)  Corn:                            $91,206.70; and
      f)  Cotton:                       $0.

287.    Thus, in 2016, Plaintiffs Landers' sales for their soybean and corn harvest were (including $40,000.00 in corn from 2016 carried over for sale in 2017):

      a)  Soybeans:     $189,140.30; and
      b)  Corn:         $131,206.70.

288.    Also in 2016, soybean and corn prices per bushel averaged roughly as follows:

      a)  Soybeans:     $8.77; and
      b)  Corn:         $3.75.

289.    In 2016, Plaintiffs Landers also lost their sweet corn crop and many crops in their home garden.  Further, the pride and reputation for quality crops that Plaintiffs Landers have built over the years has been decimated by Monsanto and dicamba.

290.    Moreover, Plaintiffs Landers and others similarly situated have suffered damage to their professional reputations, resulting in extreme disappointment, disrespect, and a diminution of trust in Plaintiffs Landers and their crops.

291.    Plaintiffs Landers' outstanding reputation with some of their leasing partners has lasted for twenty-five (25) to forty (40) years.  These same leasing partners have also complained to Plaintiffs Landers about the lack of crop production on their land, and Plaintiff Steven Landers has been forced to explain the damage to their crops and to his crops due to dicamba.

292.    In 2017, if Plaintiffs Landers and others similarly situated are damaged again even half as badly as they were in 2016, Plaintiffs Landers and others similarly situated will be out of the agricultural business entirely and risk bankruptcy.

293.    The ability of Plaintiffs Landers and others similarly situated to remain financially viable and pay their bills following their 2016 crop losses is crushing them financially.

294.    Further, as Dr. Kevin Bradley and many others in the agricultural community have observed, Plaintiffs Landers and others similarly situated will be forced to plant Monsanto's Xtend soybeans in 2017, a crop system that comes at a significant increased expense.

295.    It is inevitable that many farmers in the affected states will continue to spray dicamba on Xtend seeds in 2017, either by spraying XtendiMax or the older, less expensive, more volatile types of dicamba, once again setting in motion the disastrous consequences of 2016's dicamba tragedy to Plaintiffs Landers and others similarly situated on an epic scale.

296.     This widespread dicamba problem also includes Monsanto's organized scheme to establish a monopoly for its Xtend crops by using Plaintiffs Landers and others similarly situated as the unwilling test subjects of an incomplete Xtend crop system that will fill Monsanto's pockets at the expense of all Plaintiffs' livelihoods, heritage, health, and well-being.

297.     The experiences of Plaintiffs Landers and others similarly situated are indicative of Doe Plaintiffs throughout the affected states.  As evidenced by the numerous complaints to the affected states' departments of agriculture, the repeated stories of the same types of damage, the hearings, the news articles, statements by university researchers, and investigations by state and federal agencies, including the Federal Bureau of Investigation and the EPA, Monsanto's Xtend seeds and its defective "crop system" created a pervasive and widespread dicamba epidemic that has financially crippled all Plaintiffs throughout the affected states.

## COUNT I – STRICT LIABILITY – DESIGN DEFECT

298.     Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

299.     Monsanto designed, tested, developed, manufactured, marketed, distributed, and sold Xtend cotton and soybean seeds in the course of its ordinary business.

300.     As described above, Xtend cotton and soybean seeds were in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe herbicide was marketed by Monsanto or any other company.  Thus, the Xtend products were defective due to the lack of any safe herbicide and should not have been sold.

301.     The Xtend cotton and soybean seeds were planted by farmers which was their reasonably anticipated use.

302.     Plaintiffs were damaged as a direct result of such defective condition which existed when the product was sold.

303.    At all times, Monsanto sold its Xtend cotton and soybean seeds and knew of the defective condition and danger of its Xtend cotton and soybean seeds.

304.    The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count I of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT II – STRICT LIABILITY – FAILURE TO WARN

305.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

306.    Monsanto sold Xtend cotton and soybean seeds in the course of its ordinary business.

307.    As described above, Xtend cotton and soybean seeds were unreasonably dangerous at the time of sale.  The Xtend cotton and soybean seeds were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third parties of their defective condition because no safe herbicide was marketed by Monsanto or any other company.

308.    Monsanto did not give an adequate warning to purchasers or third parties of the danger of these Xtend crops.

309.    The Xtend cotton and soybean seeds were planted by farmers which was their reasonably anticipated use.

310.    Plaintiffs were damaged as a direct result of the Xtend cotton and soybean seeds being sold without an adequate warning.

311.    At all times, Monsanto sold its Xtend cotton and soybean seeds and knew of the danger of its Xtend cotton and soybean seeds.

312.    The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count II of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT III – NEGLIGENT DESIGN AND MARKETING

313.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

314.    Monsanto negligently designed and marketed the Xtend cotton and soybean seeds.

315.    Monsanto designed and marketed Xtend cotton and soybean seeds in the course of its ordinary business.

316.    As described above, Monsanto failed to use ordinary care in the design and marketing of Xtend cotton and soybean seeds because no safe herbicide was marketed by Monsanto or any other company.  Thus, the Xtend products were defective due to the lack of any safe herbicide and no company exercising ordinary care would have designed or marketed such a product.

317. The Xtend cotton and soybean seeds were planted by farmers which was their reasonably anticipated use.

318. Plaintiffs were damaged as a direct result of such negligence in design and marketing.

319. The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count III of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT IV – NEGLIGENT FAILURE TO WARN

320. Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

321. Monsanto designed Xtend cotton and soybean seeds in the ordinary course of its business.

322. Monsanto sold Xtend cotton and soybean seeds in the course of its ordinary business.

323. As described above, Xtend cotton and soybean seeds were unreasonably dangerous at the time of sale. The Xtend products were unreasonably dangerous when put to their reasonably anticipated use without knowledge of purchasers and third parties of its defective condition because no safe herbicide was marketed by Monsanto or any other company.

48

324.    Monsanto failed to use ordinary care by neglecting to provide an adequate warning of the danger of these Xtend products.

325.    The seeds were planted by farmers which was their reasonably anticipated use.

326.    Plaintiffs were damaged as a direct result of the Xtend cotton and soybean seeds being sold without an adequate warning.

327.    The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count IV of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT V – NEGLIGENT TRAINING

328.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

329.    Monsanto sold its Xtend cotton and soybean seeds to farmers knowing that without a safe, approved herbicide alternative that there was a significant risk that farmers would use illegal herbicides to protect their crops.

330.    Monsanto had a legal duty to innocent third parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm of the inevitable illegal spraying that would occur to protect crops grown from the Xtend cotton and soybean seeds.

331.     Monsanto had a duty to provide training to purchasers commiserate with the substantial risk of illegal herbicides and the likelihood they would be used to protect crops grown from Xtend cotton and soybean seeds.

332.     Monsanto failed to use ordinary care in the training of its purchasers to prevent illegal herbicide use and the resulting damage to third parties, including Plaintiffs.

333.     In fact, Monsanto deliberately decided not to train its dealers, applicators, and farmers on its Xtend products until the EPA released a final label for VaporGrip.

334.     Monsanto breached their legal duty to innocent third parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm.

335.     Monsanto's negligence as described above proximately damaged Plaintiffs as described herein.

336.     Plaintiffs have suffered damages to their person and property as described above.

337.     The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count V of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT VI – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

338.     Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

339.    Monsanto sold Xtend cotton and soybean seeds in the ordinary course of its business, and said seeds were purchased by farmers.

340.    Monsanto's Xtend cotton and soybean seeds were not fit for their ordinary purposes.  Specifically, the seeds could not be used in the ordinary course of farming in a safe manner without a corresponding herbicide.

341.    Farmers used the Xtend cotton and soybean seeds for their ordinary purposes – planting and attempting to grow crops from their use.

342.    Monsanto was aware that its products were not fit for use in ordinary purposes before any such seeds were sold and during the entire course of time in which the seeds have been on the market.

343.    After Plaintiffs were made aware of their damages as a result of the Xtend cotton and soybean seeds, notice was given to Monsanto.

344.    As a direct result of Monsanto's Xtend cotton and soybean seeds being unfit for the purposes for which they were sold, Plaintiffs were damaged as described above.

345.    The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count VI of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT VII – FRAUDULENT CONCEALMENT

346.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

347.    Before Monsanto ever sold its Xtend cotton and soybean seeds, and during the entire time of such sale, Monsanto has known the risks to third parties of illegal herbicide spraying. Further, Monsanto was well aware that by selling these products, Monsanto was creating a situation where illegal spraying was not only likely, but inevitable.  Further, Monsanto was well-aware of the catastrophic damages that would occur to third parties as a result of this inevitable illegal spraying.

348.    Despite Monsanto's knowledge, it intentionally and maliciously chose to conceal these facts from farmers, state regulatory and legislative bodies, farming associations, the general public, and Plaintiffs.

349.    The groups from which Monsanto concealed these facts were unaware of them.

350.    This concealed information was material to all groups described above.

351.    Monsanto knew of the described groups' ignorance of the truth and intentionally withheld the truth about its product and its risks.

352.    Monsanto intended that the above groups should act in ignorance in carrying out their purchases, oversight responsibilities, and ordinary course of business.

353.    The groups described above had a right to disclosure of these important facts.

354.    As a direct result of Monsanto's concealment of these material facts, farmers who purchased the product and the above groups were unable to perform their task to protect the public, the public was kept in ignorance, and Plaintiffs were directly harmed in the manner herein described.

355.    The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count VII of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT VIII – UNJUST ENRICHMENT

356.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

357.    As a direct result of its illegal, deceptive, and tortious actions, Monsanto has been enriched through its sale of Xtend cotton and soybean seeds.

358.    By duping the public and cynically marketing a product it knew to be unsafe, Monsanto chose to enrich itself knowing such enrichment would result in the direct destruction of valuable property, including Plaintiffs'.

359.    Monsanto illegally forced third parties, including Plaintiffs, to serve as an involuntary experimental testing ground for its new products.  Monsanto thereby enriched itself by knowingly destroying the crops of innocent third parties, including Plaintiffs.

360.    Upon information and belief, Monsanto has made millions of dollars thus far and anticipates profits of several billions of dollars from the sale of Xtend cotton and soybean seeds. This is a direct benefit to Monsanto of its tortious actions.

361.    The acceptance and retention of these profits under these circumstances is unjust. It would be inequitable for this Court to allow Monsanto to retain the profits gained through the sale of Xtend cotton and soybean seeds under these circumstances.

362.    Monsanto should be ordered to disgorge all unjust enrichment it has received to date and will receive for the next five (5) years from all sales of Xtend cotton and soybean seeds.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count VIII of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; (3) additionally, for disgorgement of profits that Monsanto has received to date and will receive for the next five (5) years from all sales of Xtend cotton and soybean seeds; and (4) for such further relief as the Court deems just and proper.

## COUNT IX – PUNITIVE DAMAGES

363.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

364.    At all times, Monsanto sold its Xtend cotton and soybean seeds and knew of the defective condition and danger of its Xtend cotton and soybean seeds.

365.    At all times, Monsanto sold its Xtend cotton and soybean seeds and knew that without a safe, approved herbicide alternative there was a significant risk that farmers and applicators would use illegal herbicides to protect their crops.

366.    The actions of Monsanto and the injuries inflicted against Plaintiffs as set forth herein show complete indifference to or conscious disregard for the safety of others, were also reckless, intentional, knowing, malicious, and willful, and entitle Plaintiffs to a recovery of punitive damages against Monsanto in a fair and reasonable amount.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count IX of this Complaint for (1) an award of such punitive damages as are fair and reasonable; and (2) for such further relief as the Court deems just and proper.

## COUNT X – CIVIL CONSPIRACY

367. Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

368. Monsanto, in a scheme to improperly market and expand the sales of its defective Xtend crop system, as described above in Counts I-IX, conspired with purchasers of its Xtend seeds for the purchasers to illegally spray dicamba on the Xtend seeds.

369. The object of the conspiracy was the unlawful marketing of Monsanto's defective Xtend crop system, the protection of its Xtend seeds and crops through the illegal spraying of dicamba-based herbicides on those seeds and crops, and a proliferation of its Xtend seeds through marketing to corner the market for GM soybeans and cotton such that farmers in the affected states would have no choice but to purchase Monsanto's Xtend crops or risk destruction to their non-dicamba tolerant crops.

370. Monsanto, through its agents and representatives, encouraged and directed its purchasers to illegally spray dicamba-based herbicides on the Xtend seeds to protect the seeds and crops.

371. Numerous purchasers of Monsanto's Xtend seeds did unlawfully spray dicamba-based herbicides on the Xtend seeds in furtherance of the conspiracy, including but not limited to hundreds of violations of state statutes and regulations governing pesticide use.

372. The unlawful actions of Monsanto and the purchasers of its Xtend seeds resulted in damages to Plaintiffs, and thereby Plaintiffs were harmed in the ways and manners described above.

WHEREFORE, Plaintiffs respectfully pray that this Court enter judgment against Monsanto on Count X of this Complaint for (1) an award of such compensatory and punitive damages as are fair and reasonable; (2) awarding Plaintiffs their costs, expenses, and reasonable attorney's fees incurred in this matter; and (3) for such further relief as the Court deems just and proper.

## COUNT XI – CLASS ACTION

373.    Plaintiffs reallege all proceeding paragraphs as if incorporated herein.

374.    Plaintiffs ask this Court to certify a class action for all Plaintiffs in the affected states whose crops and land were damaged by Monsanto's willful and negligent release of a defective Xtend crop system since the beginning of 2015.

375.    Plaintiffs Landers bring this action on behalf of themselves and as representatives of a class defined as follows: all agricultural farmers and agricultural farming organizations located in the affected states who raise non-dicamba-tolerant crops and suffered damage to those crops from dicamba that was sprayed over-the-top of Monsanto's Xtend cotton and soybean seeds from 2015 until trial in this matter.

376.    This case meets all of the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure.

377.    This class is so numerous that joinder of all members is impracticable.  The exact number of all class members can only be determined through discovery.  Based on the number of farmers and farms who have made pesticide drift complaints to their state departments of agriculture to date, there are hundreds of farmers and farms who have been damaged by dicamba in the affected states.  Upon information and belief, there are hundreds of other farmers who did

not make drift pesticide complaints to their state agencies and yet suffered crop damage from dicamba in the affected states.

378. There are questions of law or fact common to the class. All Plaintiffs in the affected states suffered damage to their crops from dicamba drift, dicamba volatilization, and dicamba spraying when dicamba was applied to Monsanto's Xtend crops by farmers and applicators. All Plaintiffs grow non-dicamba-tolerant crops or crops vulnerable to dicamba herbicides. All Plaintiffs suffered crop damage and diminished crop yields due to dicamba. All Plaintiffs suffered financial injury to their farms and their livelihoods due to dicamba.

379. The common questions of law and fact include but are not limited to:

  a) Whether Plaintiffs in the affected states suffered crop damage from dicamba due to the illegal spraying of dicamba on Monsanto's Xtend cotton and soybean seeds;

  b) Whether Plaintiffs in the affected states suffered crop damage from dicamba drift and volatilization when farmers and applicators applied dicamba to Monsanto's Xtend seeds;

  c) Whether, in 2015 and 2016 and up until trial or resolution of this matter, Monsanto released its Xtend cotton and soybean seeds in a defective condition, unreasonably dangerous when put to their reasonably anticipated use because no safe herbicide was marketed by Monsanto or any other company;

  d) Whether the Xtend seeds were defective due to the lack of any safe herbicide;

  e) Whether Monsanto knew its Xtend seeds were defective and knew that farmers who grew Xtend cotton and soybeans would spray dicamba on a seed designed to resist it;

  f) Whether Xtend cotton and soybean seed purchasers and third parties had knowledge of the defective condition of the seeds because no safe herbicide was marketed by Monsanto or any other company;

  g) Whether Monsanto gave an adequate warning to purchasers and third parties of the danger of these Xtend crops;

h) Whether Monsanto negligently designed and marketed its Xtend cotton and soybean seeds;

i) Whether Monsanto failed to use ordinary care by neglecting to provide an adequate warning of the danger of its Xtend crops;

j) Whether Monsanto had a legal duty to innocent third parties, including Plaintiffs, to use ordinary care to protect them against the unreasonable risk of harm of the inevitable illegal spraying that would occur to protect crops grown from Xtend cotton and soybean seeds;

k) Whether Monsanto had a duty to provide training to purchasers commiserate with the substantial risk of illegal herbicides and the likelihood they would be used to protect crops grown from Xtend cotton and soybean seeds;

l) Whether Monsanto failed to use ordinary care in the training of its purchasers to prevent illegal herbicide use and the resulting damage to third parties, including Plaintiffs;

m) Whether Monsanto deliberately decided not to train its dealers, applicators, and farmers on its Xtend products until the EPA released a final label for VaporGrip;

n) Whether Monsanto's Xtend cotton and soybean seeds were fit for their ordinary purposes;

o) Whether Monsanto suppressed or concealed material facts about the safety of its Xtend crop system, its risks to third parties, including Plaintiffs, that Monsanto created a situation where illegal spraying was not only likely but inevitable, and that Monsanto was well-aware of the catastrophic damages that would occur to third parties as a result of this inevitable illegal spraying;

p) Whether Monsanto was unjustly enriched at the expense of Plaintiffs; and

q) Whether punitive damages should be imposed upon Monsanto for its conduct.

380.    Plaintiffs Landers' claims are typical of the members of the class, in that Plaintiffs Landers raised non-dicamba-tolerant crops and those crops were damaged by dicamba herbicides applied to Monsanto's Xtend seeds by other farmers and applicators in the affected states. Plaintiffs were damaged by the same wrongful conduct of Monsanto.

381.    If brought individually, the claims of each Plaintiff would necessarily require proof of the same material and substantive facts, and Plaintiffs seek the same remedies.

382.    Plaintiffs Landers will fairly and adequately protect the interests of the class. Plaintiffs Landers' interests are the same as other members of the class in holding Monsanto responsible for its willful and negligent release of a defective crop system, ensuring that Monsanto does not do it again, and that injured farmers are fairly compensated for the results of Monsanto's wrongful conduct.

383.    Plaintiffs are represented by experienced counsel, well-versed in class actions and complex litigation.

384.    The provisions of Rule 23(b)(3) are met in that questions of law or fact common to the class members predominate over individual questions and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

385.    The common questions of law and fact are overwhelming, as described above and incorporated herein by reference.

386.    Individual questions are minimal.  For example, some members of the class may not grow the same crops as other members of the class or may farm more or less acreage than other members of the class, yet the source and the cause of their damages are the same.  To the extent Plaintiffs' damages created varying burdens on individuals, that can be resolved through individual damage criteria, the creation of subclasses, or an abbreviated procedure for processing individual claims.

387.    All Plaintiffs suffered the same type of damage from Monsanto's defective crop system and seeds.  All Plaintiffs also suffered the same type of harm and were damaged from the same course of conduct by Monsanto.

388.    A single action adjudicating the legal rights of Plaintiffs Landers and the class would be more efficient and more desirable than individual litigation.  As noted, class membership will likely run into the hundreds, greatly inconveniencing the judicial system, and requiring needless duplication.  Also, a single unified discovery process will greatly expedite this litigation and prevent needless, repetitive document productions and depositions from Monsanto's corporate officers, its distributors and seed retailers, other seed retailers, farmers who sprayed dicamba, and farmers who were damaged by dicamba, including Plaintiffs.

389.    The efficiency of the unified discovery process and the prohibitive expense and complexity that would attend individual cases can be illustrated the enormity of the document production on the history, cultivation, marketing, development, sale, and distribution of Monsanto's Xtend products.

390.    Likewise, a single trial court ruling upon Plaintiffs' claims would greatly improve judicial efficiency.

391.    All of these factors illustrate the benefits of concentrated litigation in a single forum.

392.    No other class action has been filed.  Thus, no other litigants' activities should be impaired.

WHEREFORE, Plaintiffs pray that this Court:

• Determine that this action may be maintained as a class action with respect to Rule 23(b)(3) of the Federal Rules of Civil Procedure with respect to Plaintiffs' claims for damages; declare Plaintiffs Landers as representatives of the class; and appoint their lawyers as class counsel; and

- Award Plaintiffs damages on their Counts I-X of this Complaint for (1) such compensatory and punitive damages as are fair and reasonable; (2) their costs, expenses, and reasonable attorney's fees incurred in this matter; (3) additionally, for disgorgement of profits that Monsanto has received to date and will receive for the next five (5) years from all sales of Xtend cotton and soybean seeds; and (4) such further relief as the Court deems just and proper.

**A JURY TRIAL IS DEMANDED ON ALL ISSUES SO TRIABLE.**

Respectfully submitted,


By: _____*/s/ Billy R. Randles*_____
Billy R. Randles, #40928MO
Beverly T. Randles, #48671MO
Angela M. Splittgerber, #53271MO
RANDLES & SPLITTGERBER, LLP
5823 N. Cypress Ave.
Kansas City, Missouri 64119
(816) 744-4779
bill@randleslaw.com
bev@randleslaw.com
angie@randleslaw.com


*Attorneys for Plaintiffs*